**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
Northern Division

| | |
|---|---|
| RACHEL ELLISON,<br>1800 E Fairmont Ave.<br>Baltimore, MD 21231<br><br>    *Plaintiff*,<br><br>**v.**<br><br>THE JOHNS HOPKINS UNIVERSITY<br>APPLIED PHYSICS LABORATORY, LLC<br>*Serve:* Paul L. Oostburg Sanz<br>11100 Johns Hopkins Rd.<br>MS 7-127<br>Laurel, MD 20723<br><br>    *Defendant*. | **CIVIL ACTION NO:**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Rachel Ellison ("Plaintiff" or "Ms. Ellison") brings this Complaint against Defendant The Johns Hopkins University Applied Physics Laboratory, LLC ("Defendant" or "APL") to redress violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq*. ("MD FEPA"). Ms. Ellison, who has autism and related medical conditions requiring workplace accommodations, was subjected to a deliberate, multi-year pattern of disability discrimination, retaliation, and unlawful termination by APL. After Ms. Ellison requested reasonable accommodations to continue working remotely due to her disabilities, reported plagiarism and misconduct by a male colleague, and filed internal EEO complaints about

discriminatory treatment, APL subjected her to escalating adverse employment actions designed to force her out of employment.

In January 2024, APL attempted to coerce Ms. Ellison onto short-term disability leave rather than provide reasonable accommodations. In February 2024, she was placed on probation under false pretenses immediately after returning from a leave of absence. In May 2024, APL revoked her reasonable accommodation for remote work without legitimate justification. On June 4, 2024, Ms. Ellison was terminated based on fabricated allegations of missed meetings. APL's conduct demonstrates a deliberate refusal to engage in the interactive process and provide legally required reasonable accommodations for Ms. Ellison's documented disabilities, as well as a sustained pattern of retaliation for Ms. Ellison's protected activities spanning years prior to her termination. Plaintiff seeks declaratory relief, compensatory damages, back pay, front pay, reinstatement, attorneys' fees, and costs.

## PARTIES

1.  Plaintiff Rachel Ellison is an individual and resident of Baltimore, Maryland, residing at 1800 E Fairmount Ave., Baltimore, MD 21231. Ms. Ellison is a person with disabilities within the meaning of the ADA and Maryland FEPA. Ms. Ellison was employed by Defendant from June 30, 2014, until her termination on June 4, 2024.

2.  Defendant The Johns Hopkins University Applied Physics Laboratory, LLC is a limited liability company organized under the laws of Maryland, with its principal place of business at 11100 Johns Hopkins Road, Laurel, Maryland 20723, within the District of Maryland.

3.  Defendant is an "employer" within the meaning of the ADA and Maryland FEPA, as a university-affiliated research center and federal contractor employing approximately 8,000 to 9,000 individuals.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal statute.

5.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims under the ADA are brought to recover damages for deprivation of rights secured by federal law.

6.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because these state law claims arise out of the same nucleus of operative facts as the federal claims properly before this Court.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant conducts substantial business in this District at its principal place of business located within the District and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## ADMINISTRATIVE REMEDIES

8.     Prior to instituting this action, on November 1, 2024, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission and the Maryland Commission on Civil Rights (EEOC Charge No. 531-2025-00709) alleging disability discrimination and retaliation by Defendant.

9.     More than 180 days have elapsed since Plaintiff filed her Charge of Discrimination on the bases of disability discrimination and retaliation for engaging in protected activity.

10.     Plaintiff received a Notice of Right to Sue from the EEOC and MCCR on January 12, 2026 and this Complaint is filed within 90 days of receipt of that Notice.[1]

## FACTUAL ALLEGATIONS

---

[1] *See* Ex. A, Notice of Right to Sue.

**Background of Plaintiff's Employment and Disability Status**

11.    As of January 2024, Ms. Ellison was employed by Defendant as an Associate Professional Staff I, working as an electrical engineer in the Asymmetric Operations Sector/Mission Critical Communications Group (AOS/QKT).

12.    Throughout her nearly ten years of employment with Defendant, Ms. Ellison consistently performed the essential functions of her position. In January 2024, just weeks before Defendant's campaign of adverse actions escalated, Mr. McKeever confirmed to Ms. Ellison on multiple occasions—including in a recorded meeting with Accommodations Coordinator Meghan Stepanek—that he had no performance concerns and that Ms. Ellison was in good standing.

13.    Ms. Ellison was diagnosed with autism in December 2021, a disability that requires workplace accommodations including the ability to work remotely and flexibility in scheduling to manage her medical needs.

14.    Ms. Ellison also has documented medical conditions requiring workplace accommodations resulting from mold exposure at Defendant's workplace in 2017, which left her with permanent health restrictions limiting her to part-time work.

15.    In September 2021, Ms. Ellison submitted her initial accommodations request.

16.    In November 2021, APL's Medical Director determined there was a medical necessity for Ms. Ellison to be able to work remotely. However, due to the COVID-19 pandemic, almost all APL staff were in a remote-work status, and the accommodations therefore were not implemented.

17.    In early 2023, APL began to pressure its employees to return to an in-office status. Ms. Ellison resisted returning to the office based on the conversation with the APL Medical Director in late 2021.

18.     Ms. Ellison reengaged reasonable accommodations request discussions with the Accommodations office, and on March 3, 2023, Defendant granted Ms. Ellison a reasonable accommodation designating her as "primarily working onsite, but with increased telework flexibility as job duties allowed," which was set to remain in effect through March 4, 2024. This grant reflected Defendant's own acknowledgment that Ms. Ellison was capable of performing her essential job functions with the accommodation in place.

19.     On December 20, 2023, Defendant's Accommodations Coordinator updated Ms. Ellison's accommodation to require a minimum of 60% onsite presence, meaning Ms. Ellison was expected to be in the office at least two full days per week (16 hours per week) given her part-time status.

**Pre-History of Discrimination, Retaliation, and Pretextual Performance Management**

20.     The adverse employment actions taken against Ms. Ellison in 2024 were not isolated incidents, but rather the culmination of a multi-year pattern of discriminatory and retaliatory conduct by Defendant's management beginning no later than 2020.

21.     In or around 2020, Defendant's management placed Ms. Ellison on a "coaching plan" authored by Assistant Group Supervisor Anthony Plummer.[2] Rather than delivering the plan himself, Mr. Plummer directed Section Supervisor Carson Dunbar to serve as its nominal author and to deliver it, after a colleague had filed an HR and legal complaint regarding Mr. Plummer's comments about Ms. Ellison. Defendant subsequently reorganized Ms. Ellison's reporting structure to install Mr. Plummer as her direct supervisor, while having Mr. Dunbar—who assumed Mr. Plummer's former role—deliver the plan Mr. Plummer had authored.

---

[2] *See* Ex. B, Coaching Plan (Plummer/Dunbar, approx. 2020).

22.     The coaching plan was then used as a pretext to deny Ms. Ellison raises and reclassifications that a prior supervisor had identified as warranted. That supervisor reported to Defendant's Human Resources and EEO offices that the adverse compensation decisions were driven by Ms. Ellison's part-time status and disability-related work restrictions, rather than legitimate performance concerns.

23.     In July 2021, during Defendant's rollout of its post-pandemic return-to-office "category" system, Mr. Dunbar informed Ms. Ellison that he wanted to "go over the implications in more detail" of her preference to remain in Category 2 (primarily remote) status. Ms. Ellison responded in writing: "I do still prefer category 2. I understand that staying remote has the potential to negatively impact my career advancement at APL. . . . With that in mind I still prefer category 2." This communication constitutes direct evidence that Defendant conditioned career advancement on Ms. Ellison's willingness to forgo disability-related accommodations.

24.     In 2021, Ms. Ellison identified verbatim plagiarism in a sponsor deliverable attributable to a male colleague (the "Colleague") and reported it to project leadership. When leadership attempted to conceal the issue, Ms. Ellison escalated her report to line management, including Mr. Dunbar, Mr. Plummer, and Group Supervisor Kenneth McKeever. Mr. McKeever stated he would investigate, and Ms. Ellison was assured she would not have to work directly with the Colleague again.[3]

25.     Following this report, the Colleague engaged in retaliatory conduct, including intentionally scheduling meetings at times when he knew Ms. Ellison had conflicting medical appointments and later complaining to management that she was "unavailable for meetings during scheduled hours." On at least one occasion, the Colleague also presented Ms. Ellison's work

---

[3] *See* Ex. C, Plagiarism email to Plummer (Aug. 16, 2021); Ex. D, Email to Follmer re: plagiarism history (May 6, 2024).

product as his own after renaming her file. Ms. Ellison documented and reported this conduct to management at the time.

26.    Despite prior assurances, management incorporated feedback originating from the Colleague—including the allegation that Ms. Ellison was "unavailable for meetings during scheduled hours"—into a Written Warning Memo issued by Mr. McKeever in February 2022. When Ms. Ellison repeatedly requested that Mr. McKeever identify the source of the negative feedback, including in the presence of Accommodations Coordinator Meghan Stepanek, he refused to do so and claimed he did not know, despite clear awareness of its origin.[4]

27.    The Written Warning Memo served as the sole justification for denying Ms. Ellison a raise for 2022, even though the underlying task referenced in the memo had been assigned in 2021 and Ms. Ellison had taken protected leave following the death of her grandfather in January 2022.

28.    Within weeks of Ms. Ellison's request for continued remote work as a disability accommodation, Mr. McKeever revoked her tuition payment benefits, citing "performance issues." Those benefits were restored only after the accommodations office became actively involved in her request. The timing of the revocation and restoration demonstrates Defendant's use of tangible employment benefits as leverage in response to Ms. Ellison's exercise of her disability rights.

29.    Defendant has a documented history of discriminatory employment practices. In January 2015, APL entered into a conciliation agreement with the U.S. Department of Labor Office of Federal Contract Compliance Programs and the Equal Employment Opportunity Commission to resolve allegations that it had discriminated against employees based on race and protected

---

[4] *See* Ex. D, Written Warning Memo (McKeever, Feb. 2022).

activity, subjected them to a hostile work environment, and retaliated against them for engaging in EEO activity. The retaliatory patterns identified in that agreement mirror the conduct alleged here.[5]

30.     Additionally, in September 2014, Defendant announced the elimination of written performance reviews in favor of informal feedback, stating that "there will be no written appraisal." Defendant's subsequent use of formalized coaching plans and written warning memoranda against Ms. Ellison—functionally indistinguishable from formal performance improvement plans—was inconsistent with its stated policy and applied selectively to her.

**January 2024: Attempt to Force Plaintiff onto Disability Leave and Protected Activity**

31.     On January 9, 2024, Ms. Ellison met with her supervisor, Kenneth McKeever, and Accommodations Coordinator Meghan Stepanek to discuss retroactive changes to her previously approved disability accommodations.

32.     During the meeting, Ms. Ellison asked Mr. McKeever multiple times to confirm whether he had any performance concerns or whether she was not in good standing. Each time, Mr. McKeever confirmed that he had no complaints regarding her work.

33.     Despite confirming the absence of any performance issues, Mr. McKeever and Ms. Stepanek informed Ms. Ellison that, rather than continuing her reasonable accommodations, they wanted her to transition to short-term disability leave, under which she would receive up to 180 days of full pay before moving to long-term disability.

34.     On January 10, 2024, Mr. McKeever reiterated this position in writing, attempting to pressure Ms. Ellison to take short-term disability leave in lieu of continuing her reasonable accommodations.

---

[5] *See* Ex. E, Semmel all-staff email re: Conciliation Agreement (Jan. 21, 2015).

35.    Faced with the prospect of being forced off active employment and anticipating further adverse action, Ms. Ellison elected to take a leave of absence beginning in January 2024.

36.    Prior to taking leave, Ms. Ellison submitted a written complaint to Mr. McKeever opposing the discriminatory treatment she was experiencing, including Defendant's attempt to force her onto disability leave rather than provide reasonable accommodations.

37.    In or around January 2024, Ms. Ellison also filed an internal complaint with Defendant's EEO Office alleging disability discrimination and retaliation for engaging in protected activity.

**February 2024: Retaliatory Probation**

38.    On or about February 16, 2024, while still on leave, Ms. Ellison emailed Mr. McKeever notifying him that the February 2022 written warning was set to expire and should be removed from her file pursuant to Defendant's policy requiring removal after two years.

39.    On February 19, 2024—two days before the warning's expiration and on Ms. Ellison's first day back from leave—Mr. McKeever issued a probation memorandum.

40.    The probation memorandum alleged performance deficiencies, including taking "unapproved" leave and failing to complete assigned tasks.

41.    These allegations were false. Mr. McKeever had approved Ms. Ellison's leave each week, as reflected in timesheets he personally approved documenting her use of vacation leave.

42.    Ms. Ellison had also informed Acting Assistant Section Supervisor Brian Hayes of her leave.

43.    The probation memorandum placed Ms. Ellison on a 30-day probation and stated that it would remain in her personnel file for three years, subjecting her to termination if she failed to meet expectations during that period.

44.     The memorandum further cited Ms. Ellison's alleged failure to attend a meeting on February 15, 2024. This allegation was likewise pretextual. Ms. Ellison was on approved leave when the meeting invitation was sent; the meeting was scheduled for her first day back but before her regular start time; and she had previously informed Mr. McKeever—on multiple occasions, including in the presence of an HR representative—that she would not attend one-on-one meetings with him without a witness present.

**February 2024: Spoliation of Evidence**

45.     On February 19, 2024—the same day Mr. McKeever issued the probation memorandum—Ms. Ellison sent an email to Section Supervisor Jonathan Follmer, copying Acting Assistant Section Supervisor Brian Hayes, concerning the ongoing EEO investigation into Mr. McKeever's treatment of her.

46.     Ms. Ellison subsequently discovered that the email had disappeared entirely from her sent folder, outbox, drafts, and deleted items folder, including after attempting recovery through Outlook's deleted items recovery function.[6]

47.     On February 26, 2024, Ms. Ellison reported the disappearance to Defendant's IT department in an email to IT staff member Alex Bonilla, stating: "Deleting emails however seems like an entirely different matter…Perhaps the most suspicious part is that the email that I referenced that seemed to vanish without a trace pertained to an open EEO investigation." She further requested that if any irregularities were identified, documentation be provided to the EEO office.[7]

48.     Mr. Follmer and Mr. Hayes each confirmed that they did not receive the February 19 email. The unexplained disappearance of an email concerning an active EEO investigation,

---

[6] *See* Ex. F, Outlook recovery screenshot (Feb. 21, 2024).
[7] *See* Ex. G, Email to Bonilla (APL IT) re: missing email (Feb. 26, 2024).

combined with the timing and circumstances, supports a reasonable inference of spoliation or interference with Ms. Ellison's communications.

**May 2024: Denial of Telework for DM-PREP Project**

49.     In April 2024, Mr. McKeever informed Ms. Ellison that she was being assigned to a new classified project referred to as DM-PREP.

50.     Upon information and belief, Mr. McKeever assigned Ms. Ellison to the DM-PREP project to force her to return to the office, as the project was designated as requiring onsite work.

51.     In late May 2024—despite Ms. Ellison's existing and approved accommodations—Jonathan Follmer, Section Supervisor and DM-PREP Project Manager, reiterated that the project would require onsite, classified work.

52.     On May 27, 2024, Mr. Follmer informed Ms. Ellison that she would no longer be permitted to telework on the DM-PREP project, even though her job duties could be performed remotely and she had successfully performed those duties remotely up to that point.

53.     Mr. Follmer further stated that, despite "best efforts," no remote work was available and that Ms. Ellison would need to either perform onsite work or seek a new accommodation or take medical leave.

54.     Ms. Ellison informed Defendant that her documented medical conditions prevented her from working onsite, consistent with her existing accommodations.

55.     On May 31, 2024, Mr. McKeever sent Ms. Ellison an email stating that if she could not report onsite for the DM-PREP project, she would be placed on leave effective June 3, 2024, pending a new set of accommodations.

56.     Ms. Ellison made clear that she was not requesting a new accommodation, as her existing accommodations permitted her to perform her job remotely and had not been revoked or modified through any interactive process.

57.     The DM-PREP project included a recurring in-person meeting scheduled weekly from April 3, 2024 through January 3, 2025 at APL's campus. The meeting invitation associated with this requirement was subsequently deleted and moved to Ms. Ellison's trash.[8]

**June 2024: Termination**

58.     On June 4, 2024, without engaging in any interactive process regarding Ms. Ellison's existing accommodations, Mr. McKeever issued a termination letter effective immediately, ending her nearly ten years of employment with Defendant.

59.     The termination letter relied on the February 2024 probation memorandum and alleged that Ms. Ellison failed to attend two in-person meetings on May 18, 2024, and June 4, 2024.

60.     The allegation regarding May 18, 2024 was demonstrably false, as that date fell on a Saturday, when Defendant's employees, including Ms. Ellison, did not work.

61.     The allegation regarding June 4, 2024 was likewise pretextual. Ms. Ellison was present and prepared to attend the meeting remotely via Zoom, but was never provided a link or means to join.[9]

62.     Earlier on June 4, 2024, prior to receiving the termination letter, Ms. Ellison sent a detailed written complaint to Mr. McKeever, Human Resources representative Andrea Gehman, and others, documenting Defendant's failure to engage in the interactive process, disputing the

---

[8] *See* Ex. H, DM-PREP meeting invitation (deleted).
[9] Nevermind the fact that Mr. McKeever had placed her on leave the day before, and therefore she would not have been permitted to attend DM-PREP meetings at all.

assertion that no remote work was available, and identifying that employees—including herself—were being classified as onsite while working remotely, raising concerns regarding improper billing practices on government contracts.[10]

63.     When Ms. Ellison subsequently contacted Ms. Gehman to correct the erroneous May 18, 2024 date in the termination letter, Ms. Gehman responded that further communication would need to proceed through counsel.

**Pattern of Discrimination and Retaliation**

64.     From at least 2020 through June 4, 2024, Defendant engaged in a pattern of denying Ms. Ellison reasonable accommodations for her documented disabilities, including attempting to force her onto disability leave in lieu of providing accommodations and revoking her ability to work remotely without legitimate justification.

65.     Defendant selectively enforced attendance and onsite presence requirements against Ms. Ellison, despite her documented medical need for remote work, while permitting other employees to continue working remotely.

66.     The timing of Defendant's adverse actions further demonstrates retaliation. The probation memorandum was issued two days before Ms. Ellison's prior written warning was set to expire and immediately following her return from leave and protected complaints. Her termination followed shortly after she refused to abandon her accommodations and continued to oppose Defendant's conduct.

67.     Defendant's stated reasons for these actions were pretextual. The allegation of "unapproved leave" was contradicted by timesheets approved by Mr. McKeever; the claim that Ms. Ellison failed to attend a May 18, 2024 meeting was impossible, as that date fell on a Saturday;

---

[10] *See* Ex. I, Email to McKeever, Gehman et al. (June 4, 2024).

and the allegation that she failed to attend a June 4, 2024 meeting was undermined by Defendant's failure to provide any means for her to attend.

68. Defendant failed to engage in the interactive process in good faith and instead used Ms. Ellison's disability and accommodation requests as a basis for adverse employment actions, culminating in her termination.

69. Ms. Ellison's colleagues observed and confirmed this broader pattern of enforcement. One colleague noted that employees were being "listed as on-campus but [did not] spend most of the time on-campus." Another explained that management had "wanted to [force in-person attendance] for a long time" and now felt empowered to do so. A third indicated that onsite presence was being increasingly monitored and that employees seeking remote work needed to "work something out" with management.

70. Upon information and belief, Defendant's senior leadership, including Mission Area Executive Charles Madison, approved a coordinated effort to force out employees with disabilities requiring remote work accommodations by assigning them to projects incompatible with remote work and reclassifying their roles accordingly.

71. At no point did Defendant identify any essential function of Ms. Ellison's position that she could not perform with her reasonable accommodations in place. To the contrary, Defendant's own conduct confirms her qualifications: for approximately three years following her accommodation request, she was assigned projects and tasks that were performed remotely; Mr. McKeever confirmed in January 2024 that she had no performance issues and was in good standing; and her timesheets were consistently approved without objection. The adverse actions taken against Ms. Ellison were not based on any inability to perform her job, but rather on Defendant's refusal to accommodate her disability.

**CAUSES OF ACTION**

**COUNT I**
**DISABILITY DISCRIMINATION (DISPARATE TREATMENT)**
**IN VIOLATION OF THE ADA**
**[42 U.S.C. § 12112(a)]**

72.     Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

73.     The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

74.     At all relevant times, Defendant was an "employer" within the meaning of the ADA, and Plaintiff is an "employee" within the meaning of the ADA.

75.     Plaintiff is an individual with a disability, including autism and related medical conditions that substantially limit one or more major life activities.

76.     Defendant had knowledge of Plaintiff's disabilities, maintained records of her disabilities, and regarded her as disabled within the meaning of the ADA.

77.     Plaintiff was a qualified individual with a disability who, with reasonable accommodation, was able to perform the essential functions of her position. As set forth above, Ms. Ellison consistently met Defendant's legitimate expectations, successfully performed all assigned remote work, and was expressly confirmed by Mr. McKeever in January 2024 to have no performance issues and to be in good standing.

78.     Defendant subjected Plaintiff to a series of materially adverse employment actions on the basis of her disability, including: placing her on a pretextual coaching plan; cutting off her tuition benefits shortly after her accommodation request and restoring them only after intervention by the accommodations office; attempting to force her onto disability leave rather than provide

accommodations despite acknowledging satisfactory performance; placing her on probation based on knowingly false allegations; revoking her remote work accommodation while falsely claiming no remote work was available; and ultimately terminating her employment based on demonstrably false and unsupported reasons.

79.    Defendant's stated reasons for its actions were pretextual and were not the true reasons for the adverse treatment Plaintiff experienced.

80.    By the acts and omissions described herein, Defendant intentionally and unlawfully discriminated against Plaintiff on the basis of her disability, depriving her of equal employment opportunities and adversely affecting the terms and conditions of her employment.

81.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

82.    As a further result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, mental anguish, humiliation, and related damages, in amounts to be determined at trial.

83.    Plaintiff is entitled to all available relief, including reinstatement or front pay, back pay, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT II
## FAILURE TO ACCOMMODATE
## IN VIOLATION OF THE ADA
## [42 U.S.C. § 12112(b)(5)(A)]

84.    Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

85.     The ADA makes it unlawful for an employer to fail to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

86.     At all relevant times, Defendant was an "employer" within the meaning of the ADA, and Plaintiff was an "employee" within the meaning of the ADA.

87.     Plaintiff was a qualified individual with a disability who could perform the essential functions of her position with reasonable accommodation. As set forth above, she successfully performed all assigned duties remotely, received confirmation from Mr. McKeever in January 2024 that she had no performance issues, and had previously been granted the requested accommodations by Defendant.

88.     Plaintiff requested reasonable accommodations for her disabilities, including continued telework and schedule flexibility to manage her medical needs.

89.     These accommodations were reasonable and would not have imposed an undue hardship on Defendant, as demonstrated by Plaintiff's successful performance while working remotely and Defendant's prior approval of such arrangements.

90.     Defendant failed to engage in the interactive process in good faith. Instead of working with Plaintiff to continue or adjust her accommodations, Defendant attempted to force her onto disability leave in January 2024.

91.     In May 2024, Defendant denied Plaintiff's continued telework accommodation in connection with the DM-PREP project without legitimate justification, falsely asserting that no remote work was available despite her ability to perform her duties remotely.

92.     In June 2024, rather than engage in the interactive process or provide a reasonable accommodation, Defendant terminated Plaintiff's employment.

93.     By these acts and omissions, Defendant unlawfully failed to provide reasonable accommodations to Plaintiff and denied her equal employment opportunities.

94.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

95.     Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

96.     Plaintiff is entitled to all available relief, including reinstatement or front pay, back pay, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT III**
**RETALIATION**
**IN VIOLATION OF THE ADA**
**[42 U.S.C. § 12203(a)]**

97.     Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

98.     The ADA makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

99.     Plaintiff engaged in protected activity by requesting reasonable accommodations, opposing Defendant's attempt to force her onto disability leave in lieu of accommodating her, and filing an internal EEO complaint in January 2024 alleging disability discrimination and retaliation.

100. Defendant subjected Plaintiff to materially adverse employment actions, including cutting off her tuition benefits following her accommodation request, placing her on probation in February 2024, revoking her remote work accommodation in May 2024, and terminating her employment on June 4, 2024.

101. There is a causal connection between Plaintiff's protected activity and Defendant's adverse actions. The timing of these actions—including the probation issued immediately after her protected complaints and the termination shortly after she continued to assert her accommodation rights—supports a strong inference of retaliatory intent.

102. The February 19, 2024 probation memorandum was issued two days before Plaintiff's prior written warning was set to expire and immediately following her return from leave and protected complaints, further demonstrating pretext and retaliatory motive.

103. Plaintiff's termination on June 4, 2024 occurred shortly after she opposed Defendant's refusal to accommodate her and insisted on her right to continue working remotely.

104. By these acts, Defendant unlawfully retaliated against Plaintiff for engaging in protected activity.

105. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

106. Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

107. Plaintiff is entitled to all available relief, including reinstatement or front pay, back pay, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT IV**
**INTERFERENCE WITH EXERCISE OF ADA RIGHTS**
**IN VIOLATION OF THE ADA**
**[42 U.S.C. § 12203(b)]**

108.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109.    The ADA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights protected under the statute. 42 U.S.C. § 12203(b).

110.    At all relevant times, Defendant was an "employer" within the meaning of the ADA, and Plaintiff was an "employee" within the meaning of the ADA.

111.    Plaintiff exercised rights protected by the ADA by requesting reasonable accommodations, opposing discriminatory treatment, and filing an internal EEO complaint.

112.    Defendant interfered with Plaintiff's exercise and enjoyment of those rights through a pattern of coercive and intimidating conduct, including: warning that continued remote work would negatively impact her career; cutting off her tuition benefits shortly after her accommodation request; assigning her to the DM-PREP project in a manner that made continued remote work untenable; issuing a strategically timed probation memorandum; and ultimately terminating her employment when she refused to relinquish her accommodation rights.

113.    Defendant's conduct was intended to pressure and deter Plaintiff from exercising her ADA rights and would dissuade a reasonable employee from continuing to seek or maintain accommodations.

114.    By these acts, Defendant unlawfully interfered with Plaintiff's exercise and enjoyment of her rights under the ADA.

115. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

116. Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

117. Plaintiff is entitled to all available relief, including reinstatement or front pay, back pay, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT V**
**DISABILITY DISCRIMINATION**
**IN VIOLATION OF MARYLAND FEPA**
**[Md. Code Ann., State Gov't § 20-606]**

118. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

119. Maryland FEPA, Md. Code Ann., State Gov't § 20-606, makes it unlawful for an employer to "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" because of the individual's disability.

120. Plaintiff was a qualified individual with a disability who was able to perform the essential functions of her position with reasonable accommodation, as demonstrated by her consistent performance, Defendant's prior grant of remote work accommodations, and Mr. McKeever's express confirmation in January 2024 that she had no performance issues and was in good standing.

121. Defendant subjected Plaintiff to materially adverse employment actions on the basis of her disability, including placing her on a pretextual coaching plan, cutting off her tuition

benefits following her accommodation request, attempting to force her onto disability leave rather than provide accommodations, placing her on probation based on knowingly false allegations, revoking her remote work accommodation, and ultimately terminating her employment based on demonstrably false reasons.

122.    Claims under Maryland FEPA are analyzed similarly to claims under the ADA and are supported by the same facts and evidence alleged herein.

123.    By these acts, Defendant unlawfully discriminated against Plaintiff on the basis of her disability in violation of Maryland law.

124.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

125.    Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

126.    Plaintiff is entitled to all available relief under FEPA, including back pay, front pay or reinstatement, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT VI**
**FAILURE TO ACCOMMODATE**
**IN VIOLATION OF MARYLAND FEPA**
**[Md. Code Ann., State Gov't § 20-606(a)(4)]**

127.    Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

128.    MD FEPA makes it unlawful for an employer to "fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee." Md. Code Ann., State Gov't § 20-606(a)(4).

129.   At all relevant times, Defendant was an "employer" within the meaning of FEPA, and Plaintiff was an "employee" within the meaning of FEPA.

130.   Plaintiff was a qualified individual with a disability who was able to perform the essential functions of her position with reasonable accommodation. As set forth above, she consistently performed her duties successfully, had previously been granted remote work accommodations by Defendant, and was expressly confirmed by Mr. McKeever in January 2024 to have no performance issues and to be in good standing.

131.   Plaintiff requested reasonable accommodations for her disabilities, including continued telework and schedule flexibility to manage her medical needs.

132.   These accommodations were reasonable and would not have imposed an undue hardship on Defendant, as demonstrated by Plaintiff's successful performance while working remotely and Defendant's prior approval of such accommodations.

133.   Defendant failed to engage in the interactive process in good faith. Instead, Defendant attempted to force Plaintiff onto disability leave in January 2024, denied her continued telework accommodation in May 2024 without legitimate justification, and ultimately terminated her employment in June 2024 rather than accommodate her.

134.   FEPA claims are analyzed similarly to claims under the ADA and are supported by the same facts and evidence alleged herein.

135.   By these acts and omissions, Defendant unlawfully failed to accommodate Plaintiff's disability in violation of Maryland law.

136.   As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, and career opportunities, in amounts to be determined at trial.

137. Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

138. Plaintiff is entitled to all available relief under FEPA, including back pay, front pay or reinstatement, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT VII**
**RETALIATION**
**IN VIOLATION OF MARYLAND FEPA**
**[Md. Code Ann., State Gov't § 20-606(f)]**

139. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

140. MD FEPA makes it unlawful for an employer to "discriminate or retaliate against any of its employees or applicants for employment . . . because the individual has opposed any practice prohibited by this subtitle; or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." Md. Code Ann., State Gov't § 20-606(f).

141. At all relevant times, Defendant was an "employer" within the meaning of FEPA, and Plaintiff was an "employee" within the meaning of FEPA.

142. Plaintiff engaged in protected activity by requesting reasonable accommodations, opposing Defendant's attempt to force her onto disability leave, and filing an internal EEO complaint in January 2024 alleging disability discrimination and retaliation.

143. Defendant subjected Plaintiff to materially adverse employment actions, including cutting off her tuition benefits following her accommodation request, placing her on probation in February 2024, revoking her remote work accommodation in May 2024, and terminating her employment on June 4, 2024.

144. There is a causal connection between Plaintiff's protected activity and Defendant's adverse actions. The timing of these actions—including the probation issued immediately after her protected complaints and the termination shortly after she continued to assert her accommodation rights—supports a strong inference of retaliatory intent.

145. The February 19, 2024 probation memorandum was issued two days before Plaintiff's prior written warning was set to expire and immediately following her return from leave and protected complaints, further demonstrating pretext and retaliatory motive.

146. FEPA retaliation claims are analyzed similarly to claims under the ADA and are supported by the same facts and evidence alleged herein.

147. By these acts, Defendant unlawfully retaliated against Plaintiff in violation of Maryland law.

148. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of wages, salary, employment benefits, tuition benefits, and career opportunities, in amounts to be determined at trial.

149. Plaintiff has also suffered and continues to suffer emotional distress, mental anguish, and related damages, in amounts to be determined at trial.

150. Plaintiff is entitled to all available relief under FEPA, including back pay, front pay or reinstatement, compensatory damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant the following relief:

(a) Declaring that Defendant's acts and practices violated the Americans with Disabilities Act and the Maryland Fair Employment Practices Act;

(b) Awarding back pay with prejudgment interest for all lost wages and benefits from June 4, 2024, to the date of judgment;

(c) Awarding front pay or reinstatement to make Plaintiff whole for future lost earnings and benefits;

(d) Awarding compensatory damages for Plaintiff's emotional distress, humiliation, mental anguish, damage to professional reputation, loss of tuition benefits, and other non-economic harm;

(e) Awarding liquidated damages under the ADA;

(f) Awarding reasonable attorneys' fees and costs pursuant to the Americans with Disabilities Act and the Maryland Fair Employment Practices Act;

(g) Awarding pre- and post-judgment interest as allowed by law; and

(h) Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Francisco E. Mundaca*
Francisco E. Mundaca, Esq.
The Mundaca Law Firm, LLC
1997 Annapolis Exchange Pkwy
Suite 300
Annapolis, Maryland 21401
Phone: (202) 474-8500
Email: fmundaca@mundacalaw.com

*Counsel for Rachel Ellison*